1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| TONG VUE, | ) | 1:09-cv-01817 GSA |
| | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER REGARDING PLAINTIFF'S SOCIAL** |
| | ) | **SECURITY COMPLAINT** |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

11
12
13
14
15
16
17
18

19                                    **BACKGROUND**

20         Plaintiff Tong Vue ("Plaintiff") seeks judicial review of a final decision of the

21 Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

22 supplemental security income benefits pursuant to Title XVI of the Social Security Act.  The

23 matter is currently before the Court on the parties' briefs, which were submitted, without oral

24 argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

25
26
27
28

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 9 & 10.

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed an application for supplemental security income benefits on October 31, 2005, alleging disability beginning in July 2004.  AR 89-90.  Her application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 41-47.  ALJ Christopher Larsen held a hearing on March 13, 2008, and issued an order regarding benefits on June 27, 2008, finding Plaintiff was not disabled.  AR 60-67. However, the Appeals Council remanded the matter to the ALJ for further consideration.  AR 68-72.  On March 16, 2009, ALJ Larsen held a second hearing, and subsequently issued an order denying benefits after finding Plaintiff was not disabled.  AR 14-21.  Thereafter, on August 19, 2009, the Appeals Council denied review.  AR 6-9.

**2008 Hearing Testimony**

On March 13, 2008, ALJ Larsen held a hearing in Fresno, California.  Plaintiff appeared and testified with the assistance of an interpreter. She was represented by attorney Melissa Proudian.  Vocational Expert ("VE") Judith Najarian also appeared and testified.  AR 273-290.

When asked to provide her date of birth, height and weight, Plaintiff testified that she did not know her birth date or her height and weight.  However, she was able to provide a California identification card reflecting a date of birth of July 2, 1955, a height of five feet and a weight of 153 pounds.  AR 277.  She is right-handed.  AR 278.

Plaintiff is married and she and her husband have twelve children, seven of whom still live at home.  The youngest child living at home is seven years; the oldest is twenty years old. AR 278.

Unable to read or write, Plaintiff does not have a driver's license.  She has never been to school, either in the United States or in Laos.  When asked whether she had attended adult school in this country, Plaintiff indicated she was exempt due to "mental conditions."  AR 279.

Plaintiff has never worked.  In fact, she has never tried to find work because she is "sick a lot and not able to do much of anything."  AR 259-260.  She is not capable of working eight

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

hours a day, five days a week because of the pain in her lower back, arms and legs.  She also complained of "an ear infection as well that sometime [*sic*] is bleeding."  AR 280.  Additionally, she suffers from "mental conditions that cause lot of stress" and agitation.  AR 280.  Plaintiff also has difficulty sleeping and suffers from memory loss.  AR 280.

With particular regard to stress, Plaintiff indicated that she has thoughts about killing herself, and indicated that she made one such attempt with a knife, but was stopped by her children.  That occurred about two months prior to the hearing.  AR 281.  Asked how often she suffers from suicidal thoughts, Plaintiff indicated about "two to three times" and "sometimes four and five times a day."  AR 281-282.  She has been suffering these thoughts for about a month.  AR 282.  Generally, Plaintiff is depressed "all the time" and it affects her ability to function.  She feels as though she can do nothing, nor does she want to do anything.  She does not have any friends and she cannot get out of the house because her older children are working.  AR 282.  Plaintiff does not have any hobbies.  AR 282-283.

Plaintiff cannot concentrate or focus and gets "angry easily sometimes."  When asked how many minutes or hours she could focus her attention at one time, Plaintiff stated she could not do so and could not "concentrate by [her]self like that."  AR 283.  If she starts to do something, soon after she is "just not there anymore."  AR 283.  She watches television sometimes; she does not know how to turn the television on, so she typically watches it when her children have turned it on.  If the children leave the television on when they leave for school, she will watch it.  AR 283.

Regarding the treatment she receives for depression, Plaintiff indicated that she attends the Kings Winery clinic group therapy program once a week.  AR 283-284.  She has been attending sessions regularly but does not see an improvement.  She sees a psychiatrist who has prescribed medications to treat her depression.  Although she could not identify the medication by name, Plaintiff indicated that her daughter knows the name of it as her daughter administers the medication.  It makes her "go to sleep" and helps "a little bit."  AR 284.

When asked about a gap in treatment with her psychiatrist, Plaintiff stated that when she is "real sick" she sees the doctor more frequently, and indicated that she had seen him the week prior to the hearing.  AR 284-285.

Plaintiff is also treated for back pain at Kings Winery.  The treatment has consisted of injections that caused an allergic reaction, a cream to treat the reaction, and then medication in the form of a pill.  Her back pain is constant.  AR 285.  With regard to the back pain specifically, Plaintiff states it affects her ability to work and make a living.  She believes the pain is likely the result of "delivering too many kids."  AR 285-286. Plaintiff's diabetes is under control.  She takes medication and follows a diabetes diet.  AR 286.

Regarding her physical abilities, Plaintiff can sit for about twenty minutes, cannot stand for one hour, and can walk for ten minutes before requiring rest.  She cannot lift any weight any longer.  AR 286.

VE Najarian was asked to consider several hypothetical questions posed by the ALJ.  First, the VE was asked to assume a hypothetical worker of Plaintiff's age, education, and work experience who can lift and carry fifty pounds occasionally and twenty-five pounds frequently, can stand and walk six hours in an eight-hour workday, and can understand, remember and carry out simple one or two-step job instructions.  AR 287.  The VE indicated that such a worker could perform medium specific vocational preparation ("SVP") 1 type jobs.  Examples of this type of work include poultry hanger, Dictionary of Occupational Titles ("DOT") 525.687-078, with 2,516 available jobs in California, multiplied by nine for a nationwide figure; hand packer/bag loader, DOT 737.687-014, with 1,620 jobs available in California, multiplied by nine for a nationwide figure; and box bender, DOT 641.687.010, with 1,631 jobs available in California, multiplied by nine for a nationwide figure.  AR 287-288.

In a second hypothetical, the VE was asked to consider the same worker, however, in this instance the worker could not maintain attention and concentration consistently throughout an eight-hour work day.  The VE indicated there were no jobs for such an individual.  AR 288-289.  The same would be true of this hypothetical worker even where the lifting and carrying, and standing and walking were further limited.  AR 289.  The VE confirmed that a hypothetical

worker who was unable to complete an eight-hour day without interruption from a

psychologically based symptom was closed to the world of work.  AR 289.

**2009 Hearing Testimony**

ALJ Larsen conducted a second hearing on March 16, 2009.  Plaintiff appeared and

testified with the assistance of an interpreter. She was represented by attorney Melissa Proudian.

VE Cheryl Chandler also appeared and testified.  AR 291-309.

With a California Identification card, Plaintiff responded to ALJ Larsen's inquiry

regarding her date of birth: July 2, 1955.  The card also indicates Plaintiff is five feet tall and

weighs 153 pounds.  AR 294.  She is married and has twelve children; the youngest was eight

years old and the oldest is thirty years old.  AR 294-295.  Five of her twelve children are still

living at home with she and her husband.  AR 295.

Plaintiff does not have a California Driver's License because she does not know how to

drive.  She gets around because her daughter-in-law will provide transportation for her.  AR 296.

She has never been to school; she cannot read or write in either Hmong or English.  She has

never had any vocational training, and has never worked in the United States.  AR 297.

When asked whether she could work an eight-hour day, five days a week, Plaintiff replied

that she could not because she suffers from pain in her arms and legs, and low back.  She also

suffers from headaches, diabetes, and visual impairments.  AR 297.  Standing for a short while

will cause her to start shaking and feel as though she is going to "fall down or black out."  AR

298.  Plaintiff also suffers from depression.  She cannot complete tasks.  AR 298.

With regard to her diabetes, Plaintiff indicated that she takes medication in the form of a

pill and tests her blood sugars regularly.  Her children read the results, and the "number [is] like

maybe one, no maybe about 150."  AR 298.  She takes Avandia every day as prescribed, and

adheres to the diet every day as well.  AR 298-299.  Plaintiff has little energy and rests three or

four times a day.  Asked how long she will rest for, she could not specify a time, rather she

indicated "until [she] feel[s] better or happier . . .."  AR 299.

Plaintiff's low back pain is a problem "five to six days [a week], like all the time too, the

pain."  AR 299.  The pain prohibits her from standing and sleeping, moving or twisting her body.

AR 299-300.  Her husband must help her turn over at night because she cannot do so.  She said

the pain "is from where I had a lot of children, that's what caused the pain."  AR 300.  She does

take medication for the back pain and it helps her "feel a little better" for a "little while,"

although she does not know the name of the medication she takes for pain.  AR 300.  When

asked about side effects of the pain medication, Plaintiff responded negatively, but did indicate

that following a single injection she suffered from itching and a rash.  AR 301.  She cannot sit in

a chair without pain, and the longest she could sit would be "not over an hour."  She could stand

for about five minutes.  AR 301.  More particularly, Plaintiff indicated she could walk about a

half a block before needing to stop.  AR 301-302.  She cannot lift any weight because of the pain

in her right arm.  It is a constant pain.  AR 302.

Vision problems make it difficult for her to see and she believes it is the result of her

diabetes.  AR 302.  When asked how often she was unable to see, Plaintiff responded that "the

most like I can't see is like ten."  Plaintiff was then asked in seven total days, how many days

would she have difficulty with her vision; she responded that she "can't see all the time" and she

attributed this also to her age.  AR 303.

Plaintiff's depression affects her ability to function because she is angry, and unable to

focus.  AR 303.  She cannot complete a task around the house, like cooking or cleaning, because

when she is performing a task, she is thinking of another, and will lose focus on the initial task.

AR 304.  When she was asked how many minutes or hours she was able to focus her attention on

something at one time, Plaintiff indicated she could not do so.  Further, Plaintiff indicated that

about ten times a day she considers suicide: "I don't want to be a human being anymore and I

want[] to die."  AR 304.  She gets angry about three or four times a day.  AR 304.  She cannot

cook because she feels "very depressed."  When she was asked about cleaning her home, Plaintiff

stated she does "not know how to do all the cleaning with [her] depression."  AR 305.  Her

children do the cleaning.  Asked what she does during the day as her children are all old enough

for school or have reached adulthood, Plaintiff indicated she stays home or walks outside.  AR

305.  She does not have any hobbies and she does not know how to turn on the television.  AR

305.

1    The medication prescribed to treat Plaintiff's depression does not help much.  If she takes

2  a lot of the medication, the doctor tells her not to.  AR 305-306.

3    Plaintiff believes the dizziness she suffers from is the result of the diabetes, and feeling

4  very hungry.  She will start to shake as though she was about to fall.  She gets dizzy about three

5  or four times per week, and each episode will last about one to two hours.  AR 306.

6    VE Chandler was asked to assume a hypothetical worker of Plaintiff's age, education and

7  work experience, who can work at a medium exertional level, and can perform simple repetitive

8  tasks.  The VE indicated that such a worker could perform work as a dishwasher or kitchen

9  helper, DOT 318.687-010, with about 20,000 jobs available in California.  Other medium

10  unskilled work identified involved poultry laborer, DOT 411.687-018, with approximately

11  61,700 jobs available in California; and agricultural laborer, DOT 403.687-010, with

12  approximately 27,500 jobs available in California.  National figures could be obtained by

13  multiplying the number by ten.  AR 307.

14    In a second hypothetical, VE Chandler was asked to assume a hypothetical worker of

15  Plaintiff's age, education and work experience that must take extra breaks during a workday that

16  amount to one to two hours everyday, in addition to the customary two breaks and meal period.

17  According to the VE, there is no available work for such an individual.  AR 308.  Lastly, the VE

18  indicated that the testimony she provided was consistent with the DOT.  AR 308.

19    **Medical Record**

20    The medical record was reviewed by the Court (AR 151-272), however, only those

21  medical records relevant to the issues on appeal will be addressed below as needed in this

22  opinion.

23    **ALJ's 2009 Findings**

24    The ALJ determined that Plaintiff had not engaged in substantial gainful activity since

25  October 31, 2005, and had the severe impairments of diabetes mellitus and depressive disorder

26  not otherwise specified.  AR 16.  Nonetheless, the ALJ determined that none of the severe

27  impairments met or exceeded one of the listing impairments.  AR 16-17.

28

1    Based on his review of the medical evidence, the ALJ determined that Plaintiff had the

2    residual functional capacity ("RFC") to perform simple repetitive medium level work.  AR 17-

3    20.  The ALJ found that Plaintiff had no past relevant work or transferable job skills, was closely

4    approaching advanced age and was unable to communicate in English.  AR 20.  Based on her

5    age, vocational background and RFC, the ALJ determined Plaintiff could perform jobs that exist

6    in significant numbers in the national economy.  Thus, the ALJ determined Plaintiff was not

7    disabled.  AR 20-21.

8                                **SCOPE OF REVIEW**

9        Congress has provided a limited scope of judicial review of the Commissioner's decision

10   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

11   the Court must determine whether the decision of the Commissioner is supported by substantial

12   evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla,"

13   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

14   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

15   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

16   401.  The record as a whole must be considered, weighing both the evidence that supports and

17   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

18   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

19   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

20   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

21   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

22   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

23   Cir. 1987).

24                                **REVIEW**

25       In order to qualify for benefits, a claimant must establish that she is unable to engage in

26   substantial gainful activity due to a medically determinable physical or mental impairment which

27   has lasted or can be expected to last for a continuous period of not less than twelve months.  42

28   U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of

                                        8

such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) had no past relevant work; yet (5) in light of her age and background, she had the RFC to perform jobs that exist in significant numbers in the national economy. AR 19-25.

On appeal, Plaintiff argues that the ALJ (1) failed to properly evaluate a medical source statement; (2) failed to assess her visual loss; (3) failed to assess her mental limitations; and (4) failed to assess her pain testimony. (Doc. 17 at 10-19.)

## DISCUSSION

### A.    *Evaluation of the Medical Source Statement by Dr. Damania*

Plaintiff argues that ALJ Larsen erred by giving Dr. Damania's opinion "'no weight'" because the opinion is not contradicted by any examining or treating physician. Further, Plaintiff argues that the ALJ erred by faulting the opinion for its lack of objective findings in support of the functional limitations identified by the doctor. Finally, Plaintiff argues that reversal is required and benefits must be granted because when Dr. Damania's opinion is properly credited, the functional limitations applied would result in a finding of disability pursuant to both the light and sedentary grid rules. AR 10-13.

Cases in the Ninth Circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456.  In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor.  *E.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995).  For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians . . .."  *Magallanes*, 881 F.2d at 752.  Rather, there was an

abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion.  *Id*. at 751-52.

Here, Dr. Damania is an examining physician, and thus, ALJ Larsen must provide specific and legitimate reasons for rejecting the opinion where he noted the report itself was contradictory.

### *Dr. Damania's Opinion*

On August 6, 2006, board certified internist Rustom Damania performed a comprehensive internal medicine evaluation.  Dr. Damania reviewed Plaintiff's medical records for the period between September 1, 2005 and March 23, 2006.  Plaintiff's chief complaints included overall joint pain, chronic low back pain, chronic headaches and insomnia.  Plaintiff advised that she lived with her family, yet does no household chores whatsoever.  AR 159.  Current medications were reported to include Wellbutrin, Avandia, Lovastatin, Metformin, Lopid, Aspirin and Tylenol.  Plaintiff's past medical history involved hypertension and diabetes mellitus.  AR 160.

The doctor's physical examination revealed that while Plaintiff was in no acute distress, she appeared to be in discomfort and walked slowly using a four-pronged cane.  She did not have any difficulty getting up and off the examination table.  AR 160.

With regard to vital signs, Plaintiff's blood pressure, pulse and respirations were normal with the exception of the vision in both eyes: 20/200.  AR 160.  Further, the doctor specifically noted Plaintiff had no difficulty entering or leaving the examination room, there was no nystagmus[3], and the visual range of motion, was normal.  Conjunctivae and cornea were normal, as was the funduscopic[4] examination.  AR 161.

---

[3]Nystagmus is the "involuntary usually rapid movement of the eyeballs (as from side to side) occurring normally with dizziness during and after bodily rotation or abnormally following head injury or as a symptom of disease."  *See* www.merriam-webster.com/medical/nystagmus as of February 15, 2011.

[4]Funduscopic is defined as "of, done by, or obtained by ophthalmoscopic examination of the fundus of the eye."  *See* www.merriam-webster.com/medical/nystagmus as of February 15, 2011.

Normal findings were recorded regarding Plaintiff's ears, nose, throat, neck, chest, and abdomen. Cardiovascular rate and rhythm were normal, as were pulses. AR 161. With regard to coordination, station and gait, Dr. Damania noted Plaintiff did not seem to cooperate well because she wanted to hold onto the cane at all times. Otherwise, her station and gait were normal, and no limping or other abnormality was noted. Plaintiff was using a four-pronged cane due to pain in the ankle joints. AR 161.

Grip strength was 5/5, and range of motion was normal with the exception of the lumbar region as Plaintiff did not wish to cooperate. AR161-162. Straight leg raising was negative, and in general, the doctor found no ankylosus, deformities, subluxations or contractures. There was no swelling, deformity or tenderness in the knee or ankle joints, and no redness. AR 162.

Regarding motor strength, Dr. Damania noted Plaintiff's lack of cooperation and his inability to definitely determine Plaintiff's motor strength. Otherwise, the doctor found no clinical abnormality or restriction. Reflexes were normal. AR 162.

Dr. Damania's diagnoses included diabetes mellitus, hypertension, arthralgias, and low back pain with no clinical evidence of radiculopathy. AR 162. The doctor opined that in the absence of any objective evidence of gross physical impairment, Plaintiff was capable of standing and walking for at least six hours in an eight-hour day, and sitting without restriction. AR 162-163. There was no objective evidence of Plaintiff's need for the cane. Further, Dr. Damania opined Plaintiff could lift at least ten pounds frequently and occasionally. The doctor noted postural limitation determinations were made difficult by Plaintiff's failure to cooperate, stating only that she could not bend, stoop or crouch. There were no manipulative limitations identified, and while there is a relevant visual impairment, the doctor noted Plaintiff had no difficulty entering or leaving the office. AR 163.

### ALJ's Related Findings

ALJ Larsen noted the following regarding the examination and opinion by Dr. Damania:

> The consulting physician, Dr. Damania, tested [Plaintiff]'s vision at 20/200, but noted she had no difficulty entering or leaving the examination room. There was no nystagmus, and funduscopic examination was normal. Dr. Damania also reported [she] refused many tests, and would not let go of her cane, although there was no obvious medical need for it. Even [Plaintiff] admits the cane was

not prescribed by a doctor. Even though Dr. Damania reported no objective evidence for gross physical impairments, he nevertheless restricted [her] ability to lift. And furthermore, based on subjective report and her refusal to perform range of motion maneuvers, Dr. Damania restricted [her] ability to bend, stoop, and crouch. I have given no weight to Dr. Damania's opinion as it is clearly contrary to his own examination.

AR 18-19, internal citations omitted. Plaintiff's argument lacks merit.

Here, the ALJ provided specific and legitimate reasons for assigning no weight to the doctor's opinion: that it was contrary to the doctor's own objective findings and based upon Plaintiff's subjective reports. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (the ALJ properly rejected the opinion of the examining physician for lack of objective support, noting that the doctor only relied on the claimant's subjective complaints and on testing within the claimant's control, and the record supported the ALJ's discounting the claimant's credibility); *see also Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (physician's opinion based to a large extent on claimant's own accounts of symptoms and limitations may be disregarded where those complaints have been properly discounted); *Magallanes v. Bowen*, 881 F.2d at 751.

In sum, ALJ Larsen gave specific and legitimate reasons, supported by the record, for rejecting Dr. Damania's opinion. Accordingly, his findings are supported by sufficient evidence and are free of legal error.

## B.     *The Visual Impairment*

Plaintiff complains that because her vision is 20/200, the ALJ was required to provide clear and convincing reasons for rejecting the opinions of Drs. Damania and Poulsen. Plaintiff further asserts that the ALJ had a duty to develop the record in this area. (Doc. 17 at 12-14.)

### *The ALJ's Findings re Vision*

ALJ Larsen found as follows:

[Plaintiff] submitted a medical record saying she was blind as of October 28, 2008. In this regard, Dr. Poulsen noted [she] could not recall a specific time when her vision decreased. On examination, uncorrected and best corrected vision was light perception in each eye. Slit lamp examination revealed a normal appearing conjunctiva, cornea, anterior chamber, iris, and lens in each eye. Dilated retina examination was essentially normal with a slight possibility of subtle optic nerve pallor and retina pigment epithelia mottling in the macula.

Based on his evaluation, Dr. Poulsen opined [Plaintiff]'s blindness was either cortical . . . or functional . . . psychological. [Plaintiff] testified her vision is impaired by diabetes; however, Dr. Poulsen reported no evidence of diabetic retinopathy.  An MRI of the brain was recommended to determine etiology of blindness, but there is no MRI in the record.

The consulting physician . . . tested [her] vision at 20/200, but noted she had no difficulty entering or leaving the examination room.  There was no nystagmus, and funduscopic examination was normal. . . .

[Plaintiff] did not mention blindness to Dr. Hirokawa.  On the contrary, she reported she watches some TV.  Her allegation of blindness is contradicted by her general appearance at the hearing.  For example, she walked into the hearing room unassisted, and sat down in the chair Ms. Proudian pointed to.  Twice during the hearing, she reached into a pocket or purse and produced her California ID card without assistance.  She also maintained eye contact with the interpreter and Ms. Proudian.  Field Office face-to-face interview notes with [her] had no visual difficulty.  Mental health progress notes indicated [her] eye contact was moderate and good.

AR 18-19, internal citations omitted.

### *The Medical Reports*

#### *Rustom Damania, M.D.*

As previously noted, Dr. Damania's report notes Plaintiff's vision to be 20/200.  AR 160. Further, the doctor noted she had no difficulty entering or leaving the examination room, nor was nystagmus present.  Range of motion, conjunctivae and cornea were all normal, as was the funduscopic examination.  AR 161.

#### *Eric J. Poulsen, M.D.*

Board certified ophthalmologist Eric J. Poulsen examined Plaintiff on October 28, 2008. AR 244-246.  Plaintiff complained of blurry vision at all distances and denied any trauma to her eyes.  AR 244.  Following examination, Dr. Poulsen indicated as follows, in relevant part:

the patient's uncorrected and best corrected vision is light perception in each eye. Confrontation visual fields are essentially nil in each eye.  Pupil exam is 4 mm constricting to 3mm with light with no afferent pupillary defect.  Intraocular pressures were normal at 16 on the right and 1 on the left.  Slit lamp exam revealed a normal appearing conjunctiva, cornea, anterior chamber, iris, and lens in each eye.  Dilated retina examination was essentially normal with a slight possibility of subtle optic nerve pallor and retina pigment epithelial mottling in the macula.
Impression:
1.  Mild maculopathy OU
2.  Mild astigmatism
3.  Presbyopia
4.  Diabetes mellitus with no diabetic retinopathy
5.  Blindness, with no specific ocular pathology seen

14

1
2

> The patient's blindness is either cortical, i.e. in the central nervous system, or 'functional' that is to say psychological. I would recommend an MRI of the brain in order to rule out central nervous system process.

3    AR 246.

4    ***Analysis***

5    Here, Plaintiff complains that, in essence, because Dr. Poulsen could not determine the

6    cause of her visual loss - be it cortical or functional/psychological - the ALJ erred by "dismissing

7    [her] visual impairment as faked in light of the uncontroverted findings . . .." (Doc. 17 at 14.)

8    With regard to an ALJ's duty to develop the record, it is Plaintiff's burden to produce full

9    and complete medical records, not the Commissioner's. *Meanel v. Apfel,* 172 F.3d 1111, 1113

10   (9th Cir. 1999). However, when the evidence is ambiguous or "the record is inadequate" to

11   allow for proper evaluation of the evidence, the ALJ has a duty to develop the record.

12   *Tonapetyan v. Halter*, 242 F.3d at 1150. The ALJ may discharge this duty in one of several

13   ways, including subpoenaing claimant's doctors, submitting questions to claimant's physicians,

14   continuing the hearing, or keeping the record open after the hearing to allow supplementation of

15   the record. *Id.*

16   Plaintiff cites Title 20 of the Code of Federal Regulations section 416.919p(b), which

17   states that the Administration will recontact the consultive examiner where the report is

18   "inadequate or incomplete." This is consistent with the general rule that an ALJ needs to further

19   develop the record only where the evidence is ambiguous or inadequate. *Tonapetyan v. Halter*,

20   242 F.3d at 1150.

21   Here, although Dr. Poulsen recommended an MRI to rule out the cause of Plaintiff's

22   alleged blindness, Dr. Poulsen's report is neither inadequate or incomplete. Where Plaintiff

23   argues the ALJ had a duty to develop the record to ensure the MRI was completed, the argument

24   lacks merit.

25   "Where as here, medical reports are inconclusive, 'questions of credibility and resolution

26   of conflicts in the testimony are functions solely of the Secretary.'" *Sample v. Schweiker*, 694

27   F.2d 639, 642 (9th Cir. 1982). Dr. Poulsen's medical report is inconclusive; that is not to say it

28

1    is inadequate or incomplete.  Additionally, it is clear the ALJ found Plaintiff's testimony to be

2    less than credible, including Plaintiff's allegations regarding her visual impairments:

3            After careful consideration of the evidence, I find [Plaintiff]'s medically-
        determinable impairments can reasonably be expected to produce her alleged
4        symptoms, but her statements about the intensity, persistence, and limiting effects
        of those symptoms are not credible to the extent they are inconsistent with my
5        evaluation of her residual functional capacity.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
6            [Plaintiff] submitted a medical record saying she was blind as of October
        28, 2008.  In this regard, Dr. Poulsen noted [she] could not recall a specific time
7        when her vision decreased. . . .
            The consulting physician . . . tested [her] vision at 20/200, but noted she
8        had no difficulty entering or leaving the examining room.  There was no
        nystagmus, and funduscopic examination was normal. . . .
9        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
            [Plaintiff] did not mention blindness to Dr. Hirokawa.  On the contrary,
10       she reported she watches some TV.  Her allegation of blindness is contradicted by
        her general appearance at the hearing.  For example, she walked into the hearing
11       room unassisted, and sat down in the chair Ms. Proudian pointed to.  Twice during
        the hearing, she reached into a pocket or purse and produced her California ID
12       card without assistance.  She also maintained eye contact with the interpreter and
        Ms. Proudian.  Field Office face-to-face interview notes [she] had no visual
13       difficulty.  Mental health progress notes indicated [Plaintiff]'s eye contact was
        moderate and good.

14

15   AR 19-20, internal citations omitted.

16          The ALJ did not err in failing to develop the record by obtaining an MRI as

17   recommended by Dr. Poulsen.  To the degree Dr. Poulsen's findings, and those of the other

18   examining physicians, were inconclusive as to the cause of Plaintiff's purported blindness, the

19   ALJ properly resolved the issue by assessing Plaintiff's credibility.  Therefore, the ALJ's

20   findings are supported by substantial evidence and are free of legal error.

21          **C.**    *Mental Impairment*

22          On appeal, and in the absence of any legal authority, Plaintiff asserts that the ALJ's

23   findings regarding her lack of a mental impairment are erroneous.  More particularly, Plaintiff

24   points to evidence in the record to support suicidal ideation and contends the "ALJ's limitations

25   to simple repetitive work do not address the severity" of her impairment, thus warranting

26   reversal.  (Doc. 17 at 15.)  Defendant contends the ALJ properly discounted her allegations of

27   suicidal ideation, and that the ALJ's findings are supported by medical evidence.  (Doc. 18 at 13-

28   15.)

1    The ALJ found Plaintiff had the severe impairment of a depressive disorder, not

2    otherwise specified.  Nonetheless, the ALJ determined the impairment does not meet or

3    medically equal one of the listed impairments.  More particularly, ALJ Larsen made the

4    following determination:

5        [Plaintiff]'s mental impairment [does not] meet or medical equal the
         criteria of listing 12.04.[5]  In so finding, I have considered the "paragraph B"

6

7    ─────────────────

8    [5] 12.04 Affective disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic
     or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves
     either depression or elation.

9        The required level of severity for these disorders is met when the requirements in both A and B are
     satisfied, or when the requirements in C are satisfied.

10   A.  Medically documented persistence, either continuous or intermittent, of one of the following:
             1.  Depressive syndrome characterized by at least four of the following:

11               a. Anhedonia or pervasive loss of interest in almost all activities; or
                 b. Appetite disturbance with change in weight; or

12               c. Sleep disturbance; or
                 d. Psychomotor agitation or retardation; or

13               e. Decreased energy; or
                 f. Feelings of guilt or worthlessness; or

14               g. Difficulty concentrating or thinking; or
                 h. Thoughts of suicide; or

15               i. Hallucinations, delusions, or paranoid thinking; or
             2.  Manic syndrome characterized by at least three of the following:

16               a. Hyperactivity; or
                 b. Pressure of speech; or

17               c. Flight of ideas; or
                 d. Inflated self-esteem; or

18               e. Decreased need for sleep; or
                 f. Easy distractibility; or

19               g. Involvement in activities that have a high probability of painful consequences which
                 are not recognized; or

20               h. Hallucinations, delusions or paranoid thinking; or
             3.  Bipolar syndrome with a history of episodic periods manifested by the full

21   symptomatic picture of both manic and depressive syndromes (and currently characterized by
     either or both syndromes);

22           AND
     B.  Resulting in at least two of the following:

23           1.  Marked restriction of activities of daily living; or
             2.  Marked difficulties in maintaining social functioning; or

24           3.  Marked difficulties in maintaining concentration, persistence, or pace; or
             4. Repeated episodes of decompensation, each of extended duration;

25           OR
     C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that

26   has caused more than a minimal limitation of ability to do basic work activities, with symptoms or
     signs currently attenuated by medication or psychosocial support, and one of the following:

27           1.  Repeated episodes of decompensation, each of extended duration; or
             2. A residual disease process that has resulted in such marginal adjustment that even a

28   minimal increase in mental demands or change in the environment would be predicted to cause the
     individual to decompensate; or

17

criteria.  To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, [Plaintiff] has moderate restriction.  In social functioning, she has mild difficulties.  With regard to concentration, persistence, or pace, she likewise has mild difficulties.  She has experienced no episodes of decompensation of extended duration.

Because [Plaintiff]'s mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, she does not satisfy the "paragraph B" criteria.

I have also considered the "paragraph C" criteria.  In this case, the evidence fails to establish the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment.  I use them to rate the severity of the mental impairments at step 2 and 3 of the sequential evaluation.  When I assess mental residual functional capacity at step 3 ½, I must go into greater detail, itemizing the functions set forth in paragraph B of the adult mental disorders listing in 12.00 of the Listing of Impairments (SSR 96-8p).  Therefore, my residual functional capacity assessment at step 3 ½ reflects the degree of limitation I have found using the paragraph B criteria at steps 2 and 3.

AR 16-17.  Later, the ALJ found as follows:

[Plaintiff] testified she has suicidal thoughts 10 times a day.  She has received mental health treatment for management of depressive symptoms including psychotropic medications.

The consulting psychiatrist, Dr. Hirokawa, evaluated [her] on August 6, 2006.  [Plaintiff] reported she had tried to kill herself two or three times, and that relatives had recently prevented her from cutting herself.  But just eight days earlier, she had told a doctor at Kings Winery Medical Clinic she had no suicidal thoughts, no suicidal intent, and no suicide plan.  Dr. Hirokawa noted [her] participation effort was marginal to questionable.  She reported she could not even remember the name of a city in Laos where she had lived 11 years.  On mental status examination, mood was depressed and affect was restricted.  Concentration for conversation was adequate.  Dr. Hirokawa diagnosed a depressive disorder, not otherwise specified.  In his discussion, he reiterated [her] participation effort was questionable.  He opined she had a GAF score of 62, indicating mild symptoms.

The Kings Winery Medical clinic doctor's assessment is remarkably similar to LCSW Phil Farina's [assessment].  In this regard, neither of them saw any evidence of hallucination or delusion.  Mr. Farina notes [Plaintiff] was cooperative and unassuming, and social functioning and concentration was appropriate. [She] attends weekly group sessions, and has shown slow improvement.

_____

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

1
2

>Even though [Plaintiff] alleges suicidal ideation, there is no history of psychiatric hospitalization.  Nor has she been seen at PACT or placed on a 72-hour hold as a danger to self or others.

3   AR 19, internal citations omitted.

4   A mental impairment must be established by medical evidence consisting of signs,

5   symptoms, and laboratory findings.  20 C.F.R. § 416.908.  Symptoms are a claimant's own

6   description of his or her impairment, and alone are not enough to establish a mental impairment;

7   signs include observable psychological abnormalities and must be medically demonstrable

8   phenomena; laboratory findings must be shown through medically acceptable laboratory

9   techniques.  20 C.F.R. § 416.928.  The regulations are clear that reports about a claimant's

10  impairments must come from "acceptable medical sources," and that a licensed social worker is

11  not an accepted medical source.  20 C.F.R. § 416.913(a).

12  ALJ Larsen acknowledged the treatment records from Kings Winery and the evaluation

13  prepared by Dr. Hirokawa.

14  ***The Relevant Records***

15  On August 6, 2006, a comprehensive psychiatric evaluation was performed by

16  psychiatrist Greg Hirokawa, Ph.D.  AR 164-169.

17  The doctor observed that Plaintiff was withdrawn throughout the interview, and that her

18  participation effort was "marginal to questionable."  AR 164.  Plaintiff's chief complaints

19  involved feeling depressed, poor sleep, suicidal thoughts, short term memory problems, poor

20  concentration, loss of interest, and feeling withdrawn and easily upset.  AR 164.  Plaintiff

21  attributed her depression to her pain and "difficulty with hearing."  She advised that two weeks

22  prior she planned to cut herself, however, her relatives intervened to stop her.  She also reported

23  financial worries and trouble with a daughter.  AR 164.

24  Regarding her past psychiatric history, Plaintiff denied any psychiatric hospital

25  admission, and reported she began receiving mental health treatment in 2005 and continues to do

26  so.  Plaintiff reported she had attempted suicide on two or three previous occasions "by knife" or

27  "hanging."  AR 165.

28

Dr. Hirokawa's mental status examination revealed the following.  Plaintiff's eye contact was good, although her facial expressions were sad.  She was withdrawn and her attitude was "somewhat pessimistic," yet her stream of mental activity was within normal limits, her association of thought was well organized, and she articulated clearly.  Her quality of speech was limited.  Plaintiff's thought content was appropriate, she denied auditory or visual hallucinations, and there was no evidence of delusional thinking.  Her mood was depressed and affect restricted.  The doctor noted that Plaintiff "denied current suicidal ideation."  AR 166.

Plaintiff was oriented times one, did not know the city or state she currently resides in, and could not give the current date and year.  Dr. Hirokawa noted her intellectual functioning to be below average.  AR 166.  She was unable to name any Presidents, did not know the capitol of the state or the governor of California, did not know why the moon appears larger than the stars, or why food is refrigerated; she did not know how many months are in a year or how many days are in a week.  She was unable to calculate the equation three plus two.  AR 166-167.  Plaintiff was unable to perform a simple three-step command, but her concentration for conversation was noted to be adequate.  She did not know how a lion and tiger are alike, how a ball and tire are alike, or how an apple and orange are alike.  AR 167.

When asked what she would do if she smelled smoke in a crowded movie theater, Plaintiff said she did not know.  When asked what she would do if she found someone's wallet on the street, Plaintiff responded that she "can't see."  AR 167.

Dr. Hirokawa diagnosed depressive disorder not otherwise specified, diabetes mellitus, and arm, leg and back pain.  He noted economic and health stressors, and assigned a current GAF[6] score of 62.  The doctor found Plaintiff's participation effort to be "marginal to questionable" and noted she was not able to name a city in Thailand where she lived for about

---

[6]The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's overall level of functioning. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV").  The DSM-IV-TR states a GAF score from 61 to 70 indicates: "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

1   eleven years.  Plaintiff's prognosis was fair, her attitude about seeking employment was "poor"

2   and she had no plans to seek work.  AR 168.

3        In conclusion, Dr. Hirokawa opined that Plaintiff could manage her own funds.  He also

4   assessed her ability as "good" regarding the following: remembering locations and work

5   procedures; understanding, remembering and carrying out very short and simple instructions;

6   maintaining attention and concentration for extended periods of time; accepting instructions from

7   a supervisor and responding appropriately to criticism; social judgment and awareness of

8   appropriate behavior; performing activities within a schedule and maintaining regular attendance;

9   functioning independently and sustaining an ordinary routine without special supervision; and

10  withstanding stress of a routine workday and dealing with various changes in the work setting.

11  AR 168-169.  The doctor determined Plaintiff's ability was "fair" with her regard to her ability to

12  understand and remember detailed instructions, complete a normal workday and workweek

13  without interruptions from psychologically based symptoms, and to interact with coworkers.  AR

14  169.  Dr. Hirokawa summed up his findings with the following comment:

15          The discrepancy between [her] mental status examination and her rating
        on the functional assessment was primarily due to the examiner['.]s belief that her
16      participation effort was questionable.  Although she has some language and
        educational issues, she was not able to answer any of the questions, even
17      questions related to her country.  Her participation effort was poor.

18  AR 169.

19          ***Analysis***

20          It appears that Plaintiff suffers from a depressive disorder.  However, a review of the

21  medical records pertaining to Plaintiff's mental health reveals that Plaintiff does not suffer from

22  at least four of the impairments identified in subdivision (A) of Listing 12.04, nor has any

23  physician indicated that Plaintiff has been markedly affected as identified in subdivision (B) of

24  Listing 12.04.  Dr. Hirokawa's examination revealed that Plaintiff's thought processes were

25  normal, and her mood appeared depressed, yet she suffered from no delusion, hallucination or

26  other thought disorder.  She was mildly impaired in concentration and attention, and was able to

27  understand, remember and carry out simple instructions, and could interact appropriately with

28  others.  These mild impairments do not significantly affect Plaintiff's ability to perform simple

repetitive medium work.  Simply put, the record is devoid of any physician finding Plaintiff

impaired to the degree required by the Listing.  Plaintiff's symptoms alone are not sufficient to

establish a mental impairment.

Moreover, a careful review of the treatment notes from Kings Winery Medical Clinic

does not establish that Plaintiff's depression severely impairs her ability to perform simple

repetitive medium work.  *See* AR 191, 193, 197, 238, 252, 254, 256, 258, 260, 262, 264.  Despite

Plaintiff's assertion to the contrary, the suicidal ideation referred to in these records was clearly

self-reported.  Plaintiff's own description of her impairment is not enough.  *See* 20 C.F.R. §

416.928.  Additionally, a mental disorder questionnaire form completed by licensed clinical

social worker Phil Farina indicates Plaintiff's depression can be properly described as a mild

impairment.  AR 218-222.  In fact, these records support the ALJ's findings.

Moreover, a psychiatric review technique prepared by M. C. Vea, M.D., on September

21, 2006, notes only a single character trait - psychomotor agitation or retardation - of Plaintiff's

depressive syndrome for purposes of subdivision "A" of the Listing criteria.  *See* AR 177-178.

Regarding the subdivision "B" criteria, the doctor found Plaintiff's activities of daily living to be

mildly restricted, as were her difficulties in maintaining social functioning, and concentration,

persistence and pace.  No episodes of decompensation were identified.  AR 183.  No subdivision

"C" criteria was identified.  AR 184.

Plainly, this record does not establish that Plaintiff's mental impairment is severe for

purposes of Listing 12.04.  Therefore, the ALJ's findings regarding Plaintiff's mental impairment

are supported by substantial evidence and are free of legal error.

**D.**    ***Plaintiff's Credibility***

Lastly, Plaintiff argues that the ALJ failed to articulate "clear and convincing rationale for

rejecting the testimony of [her] pain as well as her mental limitations."  (Doc. 17 at 18.)

The ALJ is required to make specific findings assessing the credibility of a plaintiff's

subjective complaints.  *Ceguerra v. Secretary of HHS,* 933 F.2d 735 (9th Cir. 1991).  In rejecting

the complainant's testimony, "the ALJ must identify what testimony is not credible and what

evidence undermines the claimant's complaints."  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

1996) (quoting *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988)).

"Despite the inability to measure and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from working." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). It is possible to suffer disabling pain even where the degree of pain is unsupported by objective medical findings. *Id*. "In order to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that decision." *Id*. (citing *Magallanes v. Bowen*, 881 F.2d at 755). The findings must convincingly justify the ALJ's rejection of the plaintiff's excess pain testimony. *Id*. at 602. However, an ALJ cannot be required to believe every allegation of disabling pain. "This holds true even where the claimant introduces medical evidence showing that he has an ailment reasonably expected to produce some pain." *Id*. at 603.

Once a claimant produces medical evidence of an underlying impairment likely to cause the alleged pain, the ALJ may not discredit the allegations of the severity of the pain solely because the evidence does not support plaintiff's statements. *Lester*, 81 F.3d at 834 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (*en banc*)). In this case, the ALJ did not ignore or reject Plaintiff's testimony solely because it was unsupported by objective evidence. The ALJ also made other findings in support of his determination that Plaintiff's complaints of pain were exaggerated.

In evaluating the credibility of the symptom testimony, it appears that the ALJ did consider the factors set out in Social Security Ruling 96-7p and Title 20 of the Code of Federal Regulations sections 404.1529c(4)(i)(vii) and 416.929(c)(4)(i)(vii). *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996), and *Bunnell*, 947 F.2d at 346. The SSR directs the ALJ to:

> Investigate all avenues presented that relate to subjective complaints, including claimant's prior work record and information and observations by treating physicians and third parties regarding such matters as
> 1. The claimant's daily activities.
> 2. The location, duration, frequency, and intensity of claimant's symptoms or pain;
> 3. Precipitating factors and aggravating factors;
> 4. Type, dosage, effectiveness, and adverse side effects of any pain medication;

5. Treatment, other than medication, for pain relief;
6. Any reasons used by the claimant to relieve the pain or symptoms; and
7. Other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

Here, ALJ Larsen considered the following: Plaintiff's daily activities (AR 19-20 ["She reported she is able to manage personal care including dressing, bathing, hair care, shaving, feeding herself, and toileting"]); pain medications (AR 18 ["While she is prescribed medication for pain, confirming evidence, such as reports of x-ray, CT, MRI scanning, or electrodiagnostic study does not appear in the record"]) and his own observations during the hearing (AR 19 [e.g., "she walked into the hearing room unassisted, and sat down in the chair Ms. Proudian pointed to"). *See Drouin v. Sullivan,* 966 F.2d 1255, 1258-59 (9th Cir. 1992) (ALJ's observations during the hearing, along with other evidence, constitutes substantial evidence).  The ALJ may use "ordinary techniques" in addressing credibility.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  An ALJ may also make inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).  Given Plaintiff's mild impairments, the lack of objective medical evidence, and the ALJ's own observations, these reasons amount to convincing justification for rejecting Plaintiff's excess pain testimony.  Moreover, even assuming the ALJ erred in part, this Court will not disturb his credibility determination as a whole.  *See Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one reason may have been in error).

Finally, it is not the role of this Court to redetermine Plaintiff's credibility *de novo*. Although evidence supporting an ALJ's conclusions might also permit an interpretation more favorable to Plaintiff, if the ALJ's interpretation of evidence was rational, as here, the Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.  *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

ALJ Larsen made specific findings, identifying the testimony he found not credible and the evidence that undermined Plaintiff's complaints.  *Lester v. Chater*, 81 F.3d at 834; *Ceguerra v. Secretary of HHS,* 933 F.2d 735.  As a result, his findings are supported by substantial evidence and are free of legal error.

1

## CONCLUSION

2          Based on the foregoing, the Court finds that the ALJ's decision is supported by

3  substantial evidence in the record as a whole and is based on proper legal standards.

4  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

5  Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in

6  favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff

7  Tong Vue.

8          IT IS SO ORDERED.

9  **Dated:  February 17, 2011**                        **/s/ Gary S. Austin**
                                                       UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28